## LADOFF *v.* DEMPSTER.

## LADOFF *v.* DEMPSTER.

## LADOFF *v.* DEMPSTER.

## DEMPSTER *v.* LADOFF.

PATENTS; APPEAL AND ERROR; CLAIMS AND SPECIFICATIONS; MASTER AND SERVANT.

1. When in doubt as to whether the tribunals of the Patent Office have attached the correct meaning to technical language employed in claims in interference, this court will not reverse the unanimous decisions of such tribunals on the subject.

2. The use of the word "essentially" in claims in interference calling for an electrode "essentially metallic" in composition, etc., *held*, reversing a decision of the Commissioner of Patents, to show that "metallic" was used in its proper sense, as signifying not a substance having some of the characteristic of a metal, but metal itself.

3. Claims in interference originally made by one of the parties are to be interpreted in the light of his specifications.

4. If one employed to carry out an invention by another makes valuable discoveries ancillary to the plan and preconceived design of the employer, such discoveries inure to the benefit of the employer; and the principle applies to the case of principal and assistant engaged in the work of a common employer. (Following *Braunstein* v. *Holmes*, 30 App. D. C. 328; and *Robinson* v. *McCormick*, 29 App. D. C. 98, 10 A. & E. Ann. Cas. 548.)

5. To claim the benefit of the skill and achievement of an employee, it is not sufficient that the employer had in mind the desired result and employed one to devise means for its accomplishment; but he must show that he had an idea of the means to accomplish the particular result, which he communicated to the employee in such detail as to enable the latter to embody the same in some practical form.

6. D., an assistant in the research laboratory of an electrical company engaged in experimental work looking to the improvement of magnetite arc light electrodes, made several compositions of oxides. L., a chem-

ist, but employed by the company as a skilled workman, mixed, fired, and tested for D. under his direction, but was not called upon to assist him in any other way. L. conceived the idea of treating the oxides in such a way as to reduce them to iron, which had not occurred to D., who was experimenting with a different result in view. D. was under contract with the company to assign his inventions to it, while L. was not. The company's patent department prepared an application in L.'s name, which he refused to sign, and subsequently the company, after unsuccessfully attempting to enjoin L., who had left its employ, from contracting with others, on the ground that he had orally agreed to assign his inventions to the company, filed an application in D.'s name, which was put in interference with an application by L. *Held,* that L. was the inventor.

**Nos. 656, 657, 658, and 659. Patent Appeals. Submitted January 9, 1911. Decided March 6, 1911.**

HEARING upon four separate appeals from decisions of the Commissioner of Patents in interference cases.

*Reversed in part and affirmed in part.*

The facts are stated in the opinion.

*Mr. Albert G. Davis* and *Mr. A. D. Salinger* for Dempster.

*Mr. Walter D. Edmonds, Messrs. G. H. & W. T. Howard,* and *Mr. Henry A. Seymour* for Ladoff.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The foregoing appeals are embraced in one record and were heard together, for, while there were three separate interferences, numbered in the Patent Office, 26,482, 26,483, and 26,485, respectively, one subject-matter is involved.

The counts of the several issues read as follows:

### No. 26,482.

"1. An arc light electrode composed principally of titanium oxide mixed with a metallic material.

"2. A homogeneous electrode for arc lighting consisting of titanium oxide intimately mixed and conglomerated with a metal having greater conductivity than said oxide.

"3. A homogeneous electrode for arc lighting consisting of titanium oxide intimately mixed and conglomerated with iron.

"4. An arc light pencil comprising titanium oxide intimately mixed and conglomerated with metal having greater conductivity than said oxide, substantially as and for the purpose described.

"5. An arc light pencil comprising titanium oxide intimately mixed and conglomerated with iron, substantially as and for the purposes described.

"6. An arc light electrode essentially metallic in composition containing titanium oxide.

"7. An arc light electrode composed principally of titanium oxide homogeneously conglomerated with a metallic substance having greater conductivity than said oxide."

### No. 26,483.

"1. An arc light electrode essentially metallic in composition, containing metallic iron and a titanium compound.

"2. An arc light electrode composed largely of a metallic conducting substance conglomerated with a titanium compound.

"3. An arc light electrode essentially metallic in composition, and containing a titanium compound."

### No. 26,485.

"An essentially metallic arc light electrode comprising ferric and titanic materials."

In each interference the application of Ladoff, filed June 18, 1904, is a division of his original application filed December 2d, 1903.

In interference No. 26,482, the application of Dempster was filed December 10th, 1903; in the other two, on March 26th, 1903.

The Examiner of Interferences awarded priority to Dempster on every count of each issue. On appeal to the Examiners-

in-Chief, he was affirmed as to each count, save 2 and 3 of No. 26,482, which were awarded to Ladoff. The Commissioner affirmed their decision. Each party has appealed from so much of the decision as is against him.

The arc light electrode in controversy was discovered and developed in the laboratory of the General Electric Company at Schenectady, New York. That company is the assignee of Dempster, while the invention of Ladoff is claimed by the Adams- Bagnall Company of Cleveland, Ohio, an exclusive licensee. The litigation has been conducted by said corporations. Prior to this invention carbon electrodes were in common use. These were, at first, burned in the open air, but free access of oxygen made them burn rapidly. Later, globes were used, which protected them to a considerable extent from the oxygen of the air, which increased their life, but caused a decrease in candle power. Later still, the flaming carbon was introduced through the addition of certain compounds, the volitization of which produced a colored light of high candle power. This necessitated burning in the open air and shortened the life of the electrodes. Some time in 1901, Charles P. Steinmetz, a distinguished chemist connected with the General Electric Company in an advisory capacity, originated the idea of using magnetite as a substance for electrodes, to overcome the disadvantages of those made of carbon. Practically incombustible, it would have a longer life, and at the same time would give a brilliant white light, attributed to the spectrum of iron. It seems also that Steinmetz had the idea of using titanium in some of its many forms or compounds with the magnetite. The General Electric Company maintained a large and well-equipped laboratory for the purpose of research and the development of all ideas looking to improvements in the electrical art. This laboratory was under the direction of Professor Whitney, who had a corps of assistants. All of these were under contracts with the company to assign their inventions to it. Dempster, a chemist, was one of these assistants. Ladoff, also a chemist, was employed at laborer's wages. He was not employed in research work.

So far as we can judge from the record, he was a more ac-complished chemist than Dempster.   Sometime in 1902, Demp-ster was assigned to work in developing the Steinmetz mag-netite electrode.   He kept a notebook in which he entered brief statements of his experiments, and from time to time also made written reports to the head of the department. November 4, 1902, he reported an experiment with a composi-tion consisting of 80 per cent magnetite, 18 per cent red oxide of iron, and 2 per cent potassium titanate, or hydrate of potassium.   This combination is the basis of Dempster's ap-plication made March 26, 1903.   The iron tube or shell for electrodes was then well known in the art.   Into this he proposed to force a core composed of the mixture above described, the materials being powdered and moistened suf-ficiently to become plastic and moldable.   After molding, the pencils, so called, were baked for about twenty-four hours in air gradually brought to a temperature of 200° C., which dried them.   They were then packed in crucibles surrounded with granular material, such as magnesium oxide, flint, or red oxide of iron.   The crucibles were placed in a muffle furnace grad-ually brought to a temperature of 1,200° C., which was main-tained for an hour.   As described in the application:   "The effect of this last heating is to convert the red oxide of iron, which is unstable at the temperature employed, into the mag-netic oxide of iron, the excess of oxygen being. freed and driven off.   The packing which surrounds the electrodes in this heating action prevents any other reducing action than that named from taking place."   The potassium titanate or hydrate is described as having the effect to reduce the fusing and vaporizing points, thereby increasing the material which is vaporized upon the passage of a given current.   The iron tube has one end treated to make it conductive, a simple method of which consists in fusing it over in the electric arc.   It is also stated that if the muffle furnace in which the electrodes are treated be raised somewhat over 1,200° C., the granular material of the pencils will flow together sufficiently to make the pencils comparatively good conductors of electricity, in

which case they may be used without the incasing iron tube.
The difficulty in this last operation, as suggested, is that
without great care the electrodes will be blistered by the heat
and their shape distorted. The earlier claims of this appli-
cation call for a poorly conducting filling forced into a shell;
a mixture of magnetic oxide of iron and a smaller proportion
of red oxide of iron, moistened and molded; the same mixture
with a suitable blending material; the addition of potassium
titanate to iron and oxygen chemically combined. Certain
other claims relate to the method of reducing the fusing point
by adding potassium titanate. Amendments introduced after
Ladoff's application erased in these claims the words "redu-
cing the fuisng point," and substituted, "improving the light
giving properties." Dempster continued his experiments, and
made other mixtures containing from 3 to 7½ per cent of rutile,
or titanium oxide. About February, 1903, Ladoff was as-
signed to work under Dempster, his business being to make
up electrodes after formulas furnished by Dempster. He was not
consulted in respect of the mixtures, and was expected to mix
and burn them as directed by Dempster. It may be remarked
here that none of the electrodes made from time to time, after
Dempster's formulas, proved commercially satisfactory to the
company, and the preferred form adopted was an iron shell
filled with a loose powder of mixed magnetite and a small ad-
dition of titanium oxide. This was developed into the final
form of manufacture and use of the same tube filled with a
mixture of powder, 70 per cent magnetite and 30 per cent
titanium oxide, to which chromium is added to steady the
arc.

Ladoff constantly mixed and fired electrodes according to the
formulas and methods of Dempster.

About July 20th, 1903, he conceived the idea of burning
these pencils containing rutile, in a body of coke, with a heat
and for a time sufficient to completely or substantially reduce
the magnetite to metallic iron. He tested this electrode, and
reported the result to Professor Whitney, who treated it light-
ly, saying it was "too good to be true." He says that he

told Dempster and the latter said it was "moonshine." Dempster denies this, and there is no corroboration of either. The General Electric Company maintained a well-organized patent department, at the head of which was an eminent patent lawyer, who had a corps of expert assistants. All reports of discoveries in the research laboratory were submitted to the patent department, and the members of the same were in close touch with the experts of the laboratory. It was the custom of the department to prepare applications for patents on all discoveries of any promise of improvement in the art. Ladoff went to the patent department, where a rough draft of an application for a patent for his discovery was made and submitted to him. He made some corrections, and another was prepared, which, however, was never signed or filed. It was produced from the department files. Whitney was not there when the first draft was made, but had knowledge of it later. Ladoff had been disappointed in his expectations of promotion and increase of salary, and, as he says, being satisfied that the company would do nothing for him, took a vacation in the fall and went to New York. There he made the acquaintance of lawyers, who prepared an application for him, which was filed November 5th, 1903. The lawyers had no experience in patent matters and the application was defective. He then made a contract of some kind with a promoter and new counsel was engaged. A new application was prepared and filed December 2, 1903, and it is a division of this that is in interference.

The conductivity of Dempster's electrodes in either the pencil or the powdered forms is supplied by the iron shell. The pencil of Ladoff is made conductive throughout by the reduction of the oxides to metallic iron.

Ladoff objected to the right of Dempster to make the claims 1–6 and 7 of interference No. 26,482, and these objections are the subject of elaborate discussion by the tribunals of the Office.

One contention as to Count 1 is that the words, "Composed principally of titanium oxide mixed with a metallic material,"

means that the electrode must contain a preponderance of titanium oxide, which the description of the application shows is not the case. All of the tribunals concurred in holding that the language is susceptible of the meaning that the *mixture of* the titanium of the metallic oxide and the metallic material, and not the titanium alone, forms the principal part of the electrode; and that any ambiguity is resolved by the specifications which indicate this.

Another objection relates to 1–6 and 7, and as well to counts of other interferences, and is founded on the words "metallic" and "essentially metallic" found therein. Ladoff's contention is that these words confine the electrode to one that contains a metal, as contradistinguished from oxides of iron. That the oxides of the composition are not metal in the true sense, and only become so by a process of reduction, is unquestioned. But the contention on the other hand, and the one sustained by all the tribunals of the Office, is that the word "metallic," as used, is answered by a substance containing or having the characteristics of a metal. This is supported by the fact that at the time the specifications were drawn, carbon electrodes were in universal use, in which the arc springs from the anode. Metallic electrodes were known, but had not been used commercially. In these, of every kind of composition, as in those in interference, the arc invariably springs from the cathode. As the several iron oxides are not metals in the true sense, they are often referred to as metallic substances.

We must confess to serious doubt in respect of the conclusion as to the preponderation of titanium oxide in Count 1, and as to the meaning to be given the word "metallic" in Counts 1 and 7. Being in doubt, we are not warranted in reversing the unanimous decision of the expert tribunals of the Office.

As regards Count 6 of interference No. 26,482, Counts 1 and 3 of No. 26,483, and the single issue of No. 26,485, our conclusion is different. These call for an electrode essentially metallic in composition, containing in one, metallic iron and

a titanium compound, in another, a titanium compound, and in the third, comprising ferric and titanic materials. The prefix of the word, "essentially," we think, must be taken to show that "metallic" was used in its proper sense, as signifying not a substance having some of the characteristics of a metal, but metal itself.

It is reasonable to suppose that something like this meaning, at least, was contemplated in distinguishing these claims from the others. The Examiners-in-Chief, with whom the Commissioner concurred, held that, as claims 2 and 3 of No. 26,482 contained only metal and the titanium oxide, they were not disclosed in the original specifications of Dempster, wherefore he had no right to make them. The same reasoning applies to the claims aforesaid. So far then as to the right to make the claim of Count 6 of No. 26,482, Counts 1 and 3 of No. 26,483, and the Count of No. 26,485, we disagree with the Commissioner. As to Count 1 of 26,482 and 2 of 26,483, we see no convincing reason why we should come to a different conclusion.

It follows from what has been said above that we concur with the Examiners-in-Chief and the Commissioner as regards claims 2 and 3 of No. 26,482. It remains to consider Counts 4 and 5 of No. 26,482, which were held to be different from 2 and 3. Al four of these claims were originally made by Ladoff and are to be interpreted in the light of his specifications. We must confess to seeing little, if any, difference between Counts 2 and 4 and 3 and 5. If any, it may be, as contended by Ladoff, that it applies to an addition of a percentage of carbon where one alternating current is used, and did not contemplate anything less than a complete reduction to iron.

Passing by this contention, it was held by all of the tribunals that the invention contained in No. 4 and No. 5, including a partial, or "more or less," reduction only to iron, was ancillary to the invention of Dempster's mixture, communicated by him to Ladoff, who, as his assistant, merely carried the experiment further, making the discovery which he now claims as his own invention.

The principle is well settled that if one employed to carry out an invention by another of a machine, manufacture, or composition of matter, makes valuable discoveries ancillary to the plan and preconceived design of the employer, such discoveries inure to the benefit of the employer. And the principle applies to the case of principal and assistant engaged in the work of a common employer, as these parties were. *Braunstein* v. *Holmes*, 30 App. D. C. 328–331; *Robinson* v. *McCormick*, 29 App. D. C. 98–108, 10 A. & E. Ann. Cas. 548. But, as said in the last cited case: "To claim the benefit of the employee's skill and achievement, it is not sufficient that the employer had in mind a desired result, and employed one to devise means for its accomplishment. He must show that he had an idea of the means to accomplish the particular result, which he communicated to the employee in such detail as to enable the latter to embody the same in some practical form." Dempster as an assistant in the research laboratory was set to work to improve upon the magnetite electrode of Steinmetz, and made a number of experiments in order to discover the desired result. He had made no discovery which it was his object to perfect, but was seeking one. He made several different combinations of materials. His first one, as heretofore noted, contained 2 per cent of potassium titanate, which in turn comprised a very small percentage of titanium in its compound. Later he made combinations containing from 3 to 12 per cent of titanium oxide. Others in May and June, 1903, comprised $7\frac{1}{2}$ per cent of rutile,—a titanium oxide. Ladoff was assigned the work of mixing, firing, and testing the pencils according to the express directions of Dempster. He was not called upon to advise, or to assist Dempster in any other way. Dempster had not conceived the idea of treating the oxides in such a way as to reduce them to iron. His mode of firing was intended, as he stated, to be such only as to reduce the red oxide to another form, and not to metal. If some slight reduction to metal resulted from the burning, it seems to have been confined to a slight coating or glaze on the outer surface. "If," as said by the Examiners-

in-Chief, "there was reduction during this period, it was accidental rather than intentional." This exterior coating would be conductive to some extent. But to be effective, as the evidence indicates, the reduction must extend to all parts of the pencil, or else the pencil must be inclosed in a substantial metal case. Complete reduction was never contemplated by Dempster. His controlling purpose was the development of the most desirable combination to be used in the iron case with which he was familiar. Ladoff, who, while engaged as a skilled workman, was a chemist of some learning and experience, conceived the idea, while engaged in his work, of an entire, or a substantially entire, reduction of the oxides to iron. This was his own idea. While it may be true that it would never have occurred to him but for his engagement in carrying out Dempster's ideas, it cannot be said that it was suggested to him by the latter. It was not the mere mechanical improvement of a thing that he was employed to perfect, as was the situation in the leading cases cited in the decision of the Patent Office tribunals.

The action of the patent department of the General Electric Company is strongly persuasive on this point. That department was well and skilfully managed. The reports of the work of the research laboratory were all before it for action. With full knowledge of what Dempster had been doing, it concluded that Ladoff had made the invention and proceeded to prepare a patent application for his signature. The expert counsel must have been aware that Dempster was under a contract to assign every invention made by him to the common employer of all, while Ladoff was not. Learning that Ladoff had applied for a patent through others on his own account, and would not sign the application prepared for him, efforts were made to induce him to remain in the employ of the company, and to assign his invention to it. Failing in this, a bill was filed to enjoin him from contracting with others on the ground that he had verbally contracted, on entering the employment in October 1902, to assign his inventions to the company. In the meantime, the later application of Dempster was filed. The

bill was dismissed as unfounded. The following extract from the brief of counsel makes this explanation of the course of conduct mentioned:

"The fact that the General Electric Company at one time, while Ladoff was still in its employ, contemplated the filing of a separate application in Ladoff's name, directed to this specific embodiment of Dempster's invention, that is, a completely reduced magnetite titanium oxide electrode, does not in any way affect the question now to be decided. At that time Ladoff and Dempster were both in the employ of the General Electric Company, working in its research laboratory, and presumably for the benefit of the company, so it made no special difference to the company whether the Dempster electrode with the magnetite completely reduced was specifically claimed in Dempster's application on the main invention, or separately claimed in Ladoff's application, whereas to file the separate application in Ladoff's name would undoubtedly gratify him and give him some of the recognition for which he was so incessantly clamoring. At that time there was no occasion to apply, or take into consideration, the doctrine of employer and employee, or principal and assistant. When Ladoff treacherously sold out his employer, the General Electric Company, said company was justified, both legally and morally, in insisting upon its well-established right to claim in Dempster's application the minor variation of Dempster's invention which his assistant, Ladoff, had first suggested."

These facts were known to counsel, and they were not ignorant of the law relating to employer and employee. It was known that the company would undoubtedly own the patent if granted to Dempster, and that it would have to contract for it if granted to Ladoff. It was also a matter of vital importance that the patent should be issued to the actual inventor, for otherwise it would prove unavailing if attacked.

Without further discussion of the explanation that "it made no special difference to the company" whether the patent be issued to Ladoff or to Dempster, it is sufficient to say that in our opinion it fails to explain.

· Our difference with the learned tribunals of the · Patent Office is not in respect of the credibility of the witnesses, or the weight of the evidence, in which we find no material conflict, but in the application thereto of the pertinent principles of law.

·· Our conclusion is that the Commissioner erred in the final award · of priority to Dempster of Counts 4, 5, and 6 of interference No. 26,482, Counts 1 and 3 of interference No. 26,483, and the single count of interference No. 26,485. To that extent the decisions in appeals 656, 657, and 658 will be reversed; and *that* in No. 659 will be affirmed. It is so ordered, and that this decision be certified to the Commissioner of Patents as the law directs.