24 C.C.P.A.(Patents)

### KING v. BURNER.
### Patent Appeals No. 3807.

Court of Customs and Patent Appeals.
June 21, 1937.

344

Parker, Carlson, Pitzner and Hubbard, of Chicago, Ill. (George L. Chindahl and Lincoln B. Smith, both of Chicago, Ill., of counsel), for appellant.

John L. Jackson and Arthur H. Boettcher, both of Chicago, Ill. (Brown, Jackson, Boettcher & Dienner, of Chicago, Ill., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office reversing the decision of the Examiner of Interferences awarding priority of invention to appellant.

The interference is between appellant's application, Serial No. 376,352, filed July 6, 1929, and appellee's application, Serial No. 242,367, filed December 24, 1927.

Appellant's application was assigned to the King Mechanism & Engineering Company of New York, hereinafter referred to as the King Company, and appellee's application was assigned to the Western Wheeled Scraper Company of Aurora, Ill., hereinafter referred to as the Western Company.

Of the seventeen counts in issue—Nos. 3 to 19, inclusive, Nos. 3, 5, 10, and 15 are illustrative. They read:

"3. A dump car comprising an under body, a tilting bed mounted thereon for dumping to either side of said under body, a power cylinder comprising a thrusting element, and motion transmitting mechanism connecting said thrusting element with said bed and comprising means for establishing a direct connection between said thrusting element and said bed during the initial part of the dumping operation, and means for multiplying the motion transmitted from said thrusting element to said bed during the latter part of the dumping operation.

"5. A dump car comprising an under body, a tilting bed mounted thereon. for dumping to either side of the car about later-ally spaced fulcrums, and tilting mechanism at each side of the car each comprising a power cylinder for tilting said bed, and motion transmitting mechanism comprising a lever through which the power of said cylinder is transmitted to said bed, said lever swinging bodily with said bed during the initial part of the dumping operation, and means movably connected with the under body for causing said lever to pivot relative to said bed for increasing the movement transmitted thereto during the latter part of the dumping operation.

"10. In a dumping device embodying a dumping body characterized by a low load carrying position and by a high dumping position, and a base for supporting the dumping body, the combination of the sides or a side of the dumping body attached thereto in such a manner as to permit outward and downward opening of the side by gravity, and power means for effecting movement of the body in dumping and righting and embodying mechanism for applying maximum force directly to maximum burden and indirectly applying a diminished force to extended movement of a diminished burden and including a system of levers inoperative during initial dumping movement and operative thereafter.

"15. In a railway dump car, the combination of an under-frame structure, a dumping body mounted thereon for tilting to either side, and reciprocatory power means positioned beneath said body and operable to impart the movement thereof directly to said body to initiate tilting thereof and to impart amplified movement of the power means to complete the tilting thereof."

As appellant is the junior party, the burden is upon him to establish proof of priority of invention by a preponderance of the evidence.

The invention in issue consists of a combination of elements, all of which are old, with the possible exception of the so-called Achilles lever device, included in the dumping mechanism, and is described broadly in the counts, for example count 3, as "means for multiplying the motion transmitted from said thrusting element to said bed during the latter part of the dumping operation."

With reference to the invention defined by the involved counts, the Board of Appeals said:

"The main feature of the new combination is the provision of power tilting means in which a piston rod, or mechanism at its head, of the vertically arranged power cylinder acts directly on the bottom of a side of the car to start the tilting movement and comprises a lever mechanism combined with the piston rods which subsequently or towards the end of the tilt of the body comes into play and provides a multiplication of the movement over that which would be imparted directly by the piston rod. This increased throw takes place near the end of the tilt where less force is necessary. The delayed action is accomplished by the provision of the lost motion connection in the mechanism so that the lever becomes effective only at the end of the stroke. * * *

"Each of the counts involved here on appeal includes in some scope the fundamental features, that is, the power tilting mechanism. In count 15 it is stated in very broad scope substantially in terms as two means, as means operable to impart movement directly to the car body and means to complete the tilting thereof. In the other counts it is defined in varying scope and rather specifically in some, as in count 5. Each of the counts 3 to 19 have been construed as requiring that the power means act directly on the car body first and indirectly towards the end of the tilting movement."

The lever mechanism is referred to in the record as "the Achilles lever."

It appears from the record that, on October 27, 1924, the King Company and the Western Company entered into a contract —appellant's Exhibit No. 1—whereby the King Company agreed to grant to the Western Company an exclusive license to manufacture railway dump cars under certain patents then owned or controlled by the King Company, and the Western Company agreed to exert its best endeavors to develop and improve, what is referred to in the exhibit as, "the King car"; to build such a car, and to use its best efforts to create a market for it.

It is unnecessary, due to the views we hold, to state all of the obligations of the respective parties to that contract. It is sufficient to say that it was agreed that, upon the building and testing of such a car, the Western Company might terminate the contract. The car was built, and, it is agreed by the parties, was a failure. Thereafter, on October 15, 1926, the contract was terminated by the Western Company.

It is agreed that the "King car" did not embody the involved invention.

It is claimed by counsel for appellant that, during the year 1925, appellant disclosed to the Western Company certain sketches or drawings and written descriptive matter, disclosing the so-called Achilles lever mechanism in proper relation to the other elements involved in the appealed counts.

It appears from the record that, in the summer of 1926, the witness Benbow, chief engineer of the Western Company, interviewed appellee, who at that time was living in Columbus, Ohio, relative to appellee's employment by the Western Company for the purpose of designing a railway dump car, and that, for reasons not important here, appellee was unable to accept such employment until December 3 of that year, at which time he became an employee of that company.

It is claimed by counsel for appellant that, as appellant disclosed the invention in issue in confidence to the officials and employees of the Western Company, and as appellee designed a dump car embodying appellant's invention shortly after he became an employee of that company and later filed an application for a patent for that invention for the benefit of the Western Company, knowledge of appellant's invention must be imputed to appellee, and that, therefore, appellee is not an original and independent inventor of the subject-matter in issue.

The circumstances surrounding appellee's employment by the Western Company, the fact that he stated in his preliminary statement that he conceived the invention defined in some of the counts in issue as early as December 10, 1926, at which time he and the witness Benbow, who was thoroughly familiar with appellant's disclosure to the Western Company, were on a trip together, and other facts and circumstances disclosed by the record are claimed by counsel for appellant to conclusively establish that appellee derived the invention from appellant.

In holding that appellant disclosed the invention defined by the counts in issue to the Western Company in 1925, long prior to the alleged date of appellee's conception, the Examiner of Interferences said:

"It is not disputed that the drawings offered as King's exhibits 20 and 21 and the letter, exhibit 22, were produced by King in 1925. Since Burner's earliest alleged date of conception is 1926 it follows that, if these exhibits disclose the invention in issue, King was the first to conceive it.

"The exhibits in question are thought to support the counts, in substantially the manner set forth in King's brief (pages 11 to 31). This detailed application need not be repeated here but it may be noted that exhibit 20 suggests the use of a link, instead of a roller, for transmitting the motion of the lever to the tilting bed and that the use of spaced fulcrums is conventional as pointed out in the brief of each party (Burner page 14, King page 17). The gravity side doors recited by count 10 are equally conventional. Except for these elements, each of the counts seems fairly satisfied by King's exhibit 21.

"It is objected by Burner that this sketch does not show the details of the manner in which the device is to be applied to the car. This, of course, is true, but the sketch was directed to men skilled in the art and it was therefore unnecessary to present a working drawing to scale. *It is thought to be clear that a skilled mechanic, familiar with dump cars of the type involved, could readily proportion the parts and apply the device with no other information than that given by the King exhibits under consideration.* * * *

"The exhibit [21] is merely an illustrative sketch and it was evidently intended that the exact proportioning and positioning should be worked out later. As already noted, the last mentioned steps are thought to lie within the province of a skilled mechanic. It is possible that some experimentation might be necessary to determine the best proportions, but this would not raise the matter to the dignity of invention. * * * For the purposes of this controversy it is sufficient that the King exhibits under consideration would enable a mechanic to construct an operative device satisfying the counts. * * *

"It seems advisable to reiterate at this point that the counts are not drawn to proportions of parts nor to the details of the structure by which the 'Achilles lever' is applied to the dump car. They cover the broad application of this device to the car and their allowance must have been predicated on the idea that this application was patentable." (Italics ours.)

The Examiner of Interferences further held that as the invention in issue was disclosed by appellant to the officials and employees of the Western Company, knowledge of it must be imputed to appellee; that, therefore, appellee was not an original and independent inventor of the subject-matter in issue, and, accordingly, awarded priority of invention to appellant.

Relative to appellant's conception of the invention in issue and his disclosure of it to the officials and employees of the Western Company, the Board of Appeals, in its decision reversing the decision of the Examiner of Interferences, stated:

"Among the numerous items suggested by King to the Western Company in the extensive correspondence are found a few sketches and some descriptive matter which only quite vaguely and indefinitely refer to what King designated an 'Achilles lever' mechanism. These may be identified as King's Exhibits, 15, 20, 21, 22, 29, 40, 54, 61, 120 and 256. The merits of these exhibits have been discussed at great length in the briefs of both parties and it is not believed necessary to repeat the same here in detail. *It seems to us after careful consideration that the sketches are exceedingly indefinite and are far from disclosing anything which would be at all directly usable or without very extensive further research and modification probably constituting invention.* This conclusion appears warranted from the amount of experimentation and consideration which had to be given to this feature of invention by Graner and Knab in reducing it to any kind of operable device in the summer of 1928 when King concluded to prepare application for same." (Italics ours.)

The Board held that appellee was an original and independent inventor of the subject-matter defined in the appealed counts; that, if it be assumed that appellant conceived the invention in 1925, he was not diligent in reducing it to practice, and, accordingly, awarded priority of invention to appellee.

It will be observed from the quoted excerpt from the decision of the Examiner of Interferences that he stated that the "counts are not drawn to proportions of parts nor to the details of the structure by which the 'Achilles lever' is applied to the dump car."

It should be thoroughly understood throughout the consideration of the issues

in this case that the involved invention is not the "Achilles lever" mechanism, but consists rather of a combination of elements, including the "Achilles lever" mechanism, in such relation to each other as to make an operable dump car.

Accordingly, the first question presented for our consideration is whether appellant disclosed such a combination of elements to the Western Company in 1925. If he did, the question of originality will need to be considered. If, on the contrary, he did not disclose such a combination, it will then be necessary to determine whether, from what he did disclose, the involved invention would be obvious to one skilled in the art.

We have given careful consideration to all of appellant's exhibits—sketches or drawings and written descriptive matter, his testimony, and other evidence of record relative to his disclosure to the Western Company in 1925, and we think it clearly appears that, although he disclosed to the engineers and officials of the Western Company the general idea of the use of the so-called Achilles lever mechanism in the building of a dump car, he did not disclose an operable combination of elements.

Counsel for appellant have argued at considerable length that by properly proportioning and rearranging the parts, it would have been a simple matter to have made an operable dump car from appellant's disclosure.

The Examiner of Interferences held that appellant's Exhibit No. 21, which is a sketch disclosing a contact roller on a piston rod, the roller to bear against the body of the car (at some point not disclosed) at the beginning of the dumping operation, the so-called Achilles lever pivoted on the piston rod, a link pivoted to the Achilles lever, and another link pivoted on the underframe of the car by means of a bracket, and a pivotal connection between such links, was not a working drawing; that it was merely an illustrative sketch; and that it was evidently intended by appellant that "the exact proportioning and positioning should be worked out later. As already noted, the last mentioned steps are thought to lie within the province of a skilled mechanic. It is possible that some experimentation might be necessary to determine the best proportions, but this would not raise the matter to the dignity of invention."

As hereinbefore noted, the Board of Appeals, referring to appellant's sketches, stated that they were exceedingly indefinite and were far from disclosing anything that could be used "without very extensive further research and modification probably constituting invention," and that it was supported in that view by the amount of experimentation and consideration given to that particular feature of the invention by appellant's engineers, Graner and Knab, before they were able to produce an operable structure.

It appears from the record that appellant was not an engineer; that he was not engaged as a mechanic in designing or constructing railway dump cars; that he was employed by the New York Central Railroad Company; that he was president of the King Company, which company had no office or plant; that that company never built any railway dump cars; and that its business was that of developing "patents and licenses thereunder, for dumping vehicles, and so forth."

It further appears, as stated in the brief of counsel for appellant, that, in January, 1927, appellant did not have any "complete drawings which could be turned over to a patent draftsman for the production of patent drawings"; and that he "had many rough sketches and indicative drawings and diagrams, and cardboard models, all fragmentary, so far as the illustration of a complete railway dump car was concerned, and a large mass of descriptive letters and notes." Counsel for appellant further stated, probably in explanation of the long delay in the preparation and filing of appellant's application, that it "required engineering study of all the elements of the contemplated car, and of their relation to one another, as, for example, the relation of the car body and its rolling supports to the underframe, the relation of the car body to the dumping mechanism, the relation of the drop door and door-operating mechanism to the car body and the dumping mechanism, the time relation of the car body locking and unlocking mechanism to the operation of the other mechanisms, and the valves required for the supply and control of the compressed air used for unlocking and dumping the car body."

It appears from the record that, on October 18, 1926, three days after the Western Company had terminated its contract with the King Company, appellant, his patent attorney, Cole, his patent draftsman, Waldheim, and Ansart, a patent solicitor, con-

ferred relative to the preparation of an application for a patent; that, as early as December, 1926, on the advice of his patent attorney, appellant engaged L. P. Graner and Max Knab, engineers in the employ of the Sprague Railway Safety Control & Signal Company of New York, to assist him in the preparation of a patent application; that appellant acquainted his engineers with the details of dump cars; that he turned over to them all of his notes, sketches, and descriptive matter, theretofore disclosed to the Western Company; and that, although appellant could not control all of their time, he frequently urged his engineers, draftsman, and patent attorney to do their work as quickly as possible.

It is contended by counsel for appellant that appellant, his engineers, draftsman, and patent attorney were diligent in reducing the invention to practice from January 1, 1927, to July 6, 1929, when appellant's application was filed in the Patent Office.

As appellant's patent attorney, his engineers, and draftsman were not called as witnesses, we are not informed as to the length of time and the amount of labor and experimentation it required to develop a combination of elements, including the Achilles lever mechanism, in such relation to each other as to make an operable dump car. It seems strange indeed that, under all the circumstances, we are not afforded that information. There is no evidence of record that it was possible for appellant's engineers to develop the invention in issue from information given them by appellant. On the contrary, there is evidence—appellant's Exhibit No. 216, hereinafter quoted—tending to establish that they could not do so.

In view of the fact that it is insisted by counsel for appellant that appellant, his engineers, draftsman, and patent attorney were diligent from January 1, 1927, to July 6, 1929, when appellant's application was filed, we think it is fair to assume that they were unable to produce a combination of elements, including the Achilles lever mechanism, in such relation to each other as to make an operable dump car from the sketches or drawings and written descriptive matter disclosed by appellant to the Western Company in 1925. No other conclusion is possible, we think, in the light of the facts and circumstances appearing of record.

It may be observed, furthermore, that, long prior to June 20, 1928, appellant had had full opportunity to examine the Western Company's trucks which embodied the invention in issue, and to observe them in operation. Nevertheless, on June 20, 1928, Graner, one of appellant's engineers, wrote to appellant—appellant's Exhibit No. 216—as follows:

"We made tests with the Achilles lever model and found the following:

"The dumping both of the fully loaded and the empty car proceeds satisfactorily until the Achilles lever itself comes into play which corresponds to about the last three inches of the piston stroke. At this point the required force is very great. This is due to two reasons: one of the unfavorable leverage of the Achilles lever which of course cannot be cured, and the other, due to binding.

"The binding is caused by the fact that the Achilles lever being free on one of its ends starts the operation at an unfavorable angle and gives to the pressure of the piston rod—respectively the intermediate lever —whereby the piston rod tends to push the Achilles lever instead of raising it.

"It looks to us as if this binding can be overcome—at least partly by either providing a stop for the Achilles lever or by anchoring its free end.

"We shall proceed in this direction. * * *"

Carbon copy to Mr. Cole.

On appellant's Exhibit No. 244, which consists of drawings dated July 24, 1928, and shows the "Achilles lever mechanism" in proper relation with other parts of the truck, we find the following notation: "Explained to Mr. King and me today July 24, 1928 by Mr. Knab. [signed] John Waldheim."

We think it is clear from the record that appellant did not have a full and complete conception of the invention in issue prior to appellee's conception and reduction of it to practice in 1927, and that, therefore, he could not have disclosed it to appellee's assignee the Western Company either in 1925 or 1926.

We are of opinion that the Board of Appeals reached the right conclusion. Accordingly, its decision is affirmed.

Affirmed.