39 C.C.P.A.(Patents)

## BARNET v. WIED.

Patent Appeal No. 5833.

United States Court of Customs
and Patent Appeals.

March 18, 1952.

Charles H. Andros, Albany, N. Y., for appellant.

I. Richard Paris, Washington, D. C., for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON and WORLEY, Judges.

JOHNSON, Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention of the subject matter defined by the four counts in issue to appellee Carl A. Wied.

The interference is between appellee's application No. 761,644, filed July 17, 1947, and appellant's application No. 767,151, filed August 7, 1947. Thus appellant is the junior party.

The invention relates to a device for cleaning or stripping garnetting machines. Counts 1 to 3 are drawn to an apparatus, whereas count 4 is a method claim.

Count 1, which is the original count, is considered illustrative of the apparatus counts. It reads as follows:

"1. An apparatus for the cleaning of the garnett cylinder and doffer roll of a conventional garnett machine, having a cleaning head, said head comprising a brush, a compressed air nozzle, and a suction nozzle, the brush having relatively long resilient wire bristles slightly bent at their free ends, the compressed air nozzle being seated in the brush and cooperating with same to free the objectionable materials from the cylinder or roll by means of a compressed air blast, the suction nozzle being located adjacent said brush and air nozzle, a supporting frame for mounting said head upon said machine coextensive with said cylinder and roll, a traversing carriage for carrying said head upon said frame, a traverse gear incorporated in the supporting frame for co-operating with said carriage to cause the cleaning head to reciprocate along the length of said frame pivotal means incorporated in said supporting frame to enable the cleaning head to operate upon either the garnett cylinder or the doffer roll, and means to enable said head to be brought into or out of engagement with said cylinder or roll."

Method count 4 reads as follows: "4. Those steps in the method of stripping a garnetting machine which comprise simultaneously subjecting the surface thereof to be stripped to a combing action and a jet of compressed air to loosen the dirt thereon while said machine is in operation, and continuously removing the dirt, as loosened, by means of a vacuum."

As appears from the counts, the subject matter of the involved invention relates to cleaning or "stripping" the garnett cylinder and doffer roll of a conventional garnett machine. In his application, the senior party Wied shows a series of horizontally disposed cylinders or rolls of various sizes which include a garnett cylinder, a doffer roll, and a series of worker rolls. Flat wire having sharp teeth on one edge is tightly wrapped on edge around these cylinders to form a multiplicity of sharp teeth which operate on textile material to tear it apart and reduce it to shoddy. In operation, the teeth become clogged with fiber, dirt and grease to such extent that the cylinders become smooth and the machine does not function properly unless these surfaces are cleaned periodically. The cleaning apparatus disclosed in the counts comprises a head which includes a brush consisting of wire teeth mounted on a block-like member, an air blast nozzle which extends through the block and the wire teeth of the brush, and a vacuum nozzle. The brush and air blast nozzle are mounted adjacent the forward end of the vacuum nozzle which is considerably larger than the air blast nozzle. The cleaning head is mounted on the carriage of a traversing mechanism which causes it to be carried back and forth along the horizontal axis of the cylinder being cleaned.

The supporting structure of the head is such that the head may be pivoted in order to operate on either the doffer roll or the garnett cylinder. The application of the junior party Barnet shows a similar apparatus.

Previous to the involved invention the working surfaces of a garnett were cleaned by hand by a workman using a comb, formed by securing a piece of card clothing to a piece of wood, which was held against the working surfaces of the garnett cylinders by hand while the cylinders were rotating. The workman was compelled to lie underneath the machine in order to reach some of these surfaces, and to stand on top of it in order to reach other surfaces. The card clothing forming the comb would soon become clogged with dirt and fibers which were removed by knocking the comb on the floor or some other surface. On May 15, 1946, a workman was seriously injured while cleaning the operating surfaces of a garnetting machine at the plant of Albany Woolen Mills, Inc., of which appellant is president. At that time appellee Wied was foreman of the garnett department of that plant but was temporarily working at the nearby plant of William Barnet & Sons, Inc. of which appellant is also president. Immediately following the accident, appellee was notified and he went to the Albany Woolen Mills plant and assisted in getting the injured workman released from the machine.

It was the occurrence of this accident which lead to development of the machine covered by the counts in issue. Both parties rely on the same actual reduction to practice and the case therefore involves the question of originality. The testimony as to what happened after the accident, however, is very conflicting.

▐ Inasmuch as Barnet is the junior party, the burden is upon him to establish priority of invention by a preponderance of evidence. Shumaker v. Paulson, 136 F.2d 700, 30 C.C.P.A., Patents, 1156; also, see Cooper v. Hubbell, 53 F.2d 1072, 19 C.C.P.A., Patents, 790, and McCormick v. Plumstead, 94 F.2d 999, 25 C.

C.P.A., Patents, 925. If the junior party proves he is an employer who has employed the senior party to perfect the details of an invention which he has conceived, he is, with some exceptions,[1] entitled to the benefits of his employee's work. Cooper v. Hubbell, supra; Lewis v. Strom, 52 App.D.C. 251, 285 F. 985. Where the employer who is junior party prima facie proves such an employer-employee relationship, although the burden of proof is not shifted to the employee senior party, the latter has the duty to go forward with proof to overcome the prima facie case made by the junior party. Shumaker v. Paulson, supra; McCormick v. Plumstead, supra. However, the rule above that the work of the employee inures to the benefit of the employer does not apply where the employer's proof fails to show that he actually conceived the device, or, if he did, that he communicated it to his employee. Lewis v. Strom, supra. As pointed out by the court in Robinson v. McCormick, 29 App.D.C. 98: "* * * To claim the benefit of the employee's skill and achievement, it is not sufficient that the employer had in mind a desired end result, and employed one to devise means for its accomplishment. He must show that he had an idea of the means to accomplish the particular result, which he communicated to the employee in such detail as to enable the latter to embody the same in some practical form. * * *"

In cases where the junior party claimed to be entitled to the benefits of the work of the senior party by virtue of a contractual relationship analogous to that of employer and employee, this court has held that the junior party is not so entitled when the concept he disclosed to the senior party lacked the essential or vital element or elements of the invention. Curtis v. Land, 129 F.2d 549, 29 C.C.P.A., Patents, 1118; King v. Burner, 90 F.2d 343, 24 C.C.P.A., Patents, 1312.

The outcome of this proceeding is to be determined in the light of the foregoing rules.

According to appellant, he had previously tried unsuccessfully to develop a me-

---

1. See Ladoff v. Dempster, 36 App.D.C. 520.

chanical cleaning device in 1934. He stated, however, that after the abortive attempt in 1934 he did not work seriously on such a device until after the accident which occurred on May 15, 1946. He testified further that on the day of the accident he arrived at the plant after the injured workman had been taken to the hospital; that when he arrived he talked to Frank Long (general manager of Albany Woolen Mills, Inc.) and Lewis Muhlfelder (nephew of appellant and treasurer of the Albany Woolen Mills, Inc.) and told them "something must be done to overcome such accidents"; and that he told Long to take up with Hill (master mechanic of Albany Woolen Mills, Inc.) and appellee Wied the development of a practical device to overcome the problem of cleaning the garnetts. Barnet's testimony then continues as follows:

"Q. 52. What else did you tell Mr. Long * * * on the 15th? A. I told Mr. Long to get them working on it so we could see some results very quickly, as quickly as possible.

"Q. 53. Tell us what you told them. Everything that you said. A. That I was sure * * * quite certain that using a vacuum arm would not remove this dirt satisfactory, and that they would require a piece of card clothing which would dig into the part that was being stripped. In other words to loosen the dirt. I said, "You might not have the results that I would like to see because if you had this piece of card clothing it would be filled very quickly and you might have to use air to blow it out. The air, of course, would be of great value in blowing the dirt out. I think that covers it."

Long testified that on May 15, 1946, Barnet suggested that they might be able to clean the garnett with a vacuum and a brush similar to a hand card and that he said, "You may find that with the use of a vacuum and a brush and a traversing carriage, that the brush will clog, and you might need a jet of compressed air."

Muhlfelder testified that he was present at the above-mentioned conversation and that, after referring to a wire brush and vacuum device, appellant said "he was not sure that this would be successful and if this was not, that we would have to go further on and prossibly even to the use of compressed air."

Hill testified that at a conference on May 16, 1946, "Mr. Long had told me then that Mr. Barnet had outlined a plan to him for stripping the garnett with a brush vacuum and that we may need compressed air * * *."

The record clearly indicates that it was the use of compressed air in conjunction with the other components of the cleaning device which formed the essentially novel feature of the counts in issue. Proposed count D, which was drawn to a system similar to that in counts 1 to 3 but contained no provision for compressed air as recited in the counts, was held by the Primary Examiner to be unpatentable over the prior art.

Barnet's exhibit D, a rough sketch dated May 25, 1946, shows a unit having just a brush and a vacuum tube. It of course would not meet the counts in issue since it had no provision for compressed air. Long testified that Barnet's exhibit D is the sketch he made at Barnet's suggestion. He also says he did not put the date on Barnet's exhibit D at the time he made it but the date May 25, 1946, was put on it after a test which was made on May 28, 1946. Hill says he first saw Barnet's exhibit D about May 25, 1946, and that Long told him, "This is what Mr. Barnet had in mind, and go ahead and make it up."

Appellant testified that exhibit D employed his ideas of a device to be tested and that, in accord with his instructions, such a device was tested on the smaller worker rolls in the carding machine room of Albany Woolen Mills Co. about a week after the accident. Barnet appears to be referring to the test of May 28, 1946. His testimony at this point continues as follows:

"Q. 69. * * * Were you present at that test? A. Yes.

"Q. 70. Could you tell us about it? A. We raised the dirt so much so, that we figured we were perfectly safe in going forward.

"Q. 71. Do you recall having given any instructions to anybody as to what to do after that? A. I told Long and Hill to go ahead and work on further devices to strip it * * * to attach them to the cylinder and garnett.

"Q. 72. Now, in your experience would you say that a worker is easier or harder to strip than a cylinder and doffer? A. I would say that a worker is more difficult to strip because there is such a small area."

No mention is made in Barnet's testimony about any reference at this time to the use of compressed air.

It is interesting to note that part of Long's testimony about this test is contradictory to that of Barnet. When asked what was the result of these tests, he replied: "A. The tests were fairly satisfactory. However, Mr. Barnet told all of us not to be too optimistic because when we started to test on cylinders and doffers, we would find it much more difficult."

A vacuum system for cleaning garnetts comprising a vacuum nozzle provided with a brush, such as that used in the test on May 28, 1946, would not satisfy any of the counts, all of which refer to compressed air.

Barnet's exhibit E is described by Long as the first working drawing of the bracket which he made on or about June 5, 1946, at Barnet's suggestion, the bracket being a part of the cleaning head to support the vacuum tube when it is extended through to the doffer. Exhibit E, like exhibit D, does not involve any compressed air. Barnet's exhibit J, which is similar to the device of exhibit D, has an opening in the card clothing which could be for connection to a source of compressed air, but there is no evidence as to when the opening was put in the device except that it was not done until after the test of the unit shown in exhibit D, on or about May 28, 1946.

There is no testimony on behalf of appellant which shows anything further occurred relative to the use of compressed air although the testimony disclosed that provisions for its use were incorporated in the completed device which was satisfac-torily tested on or about July 19, 1946. The air compressor which was used in this test was ordered in August 1945 for other purposes. It arrived July 8, 1946, and was completely installed on or about July 18, 1946. No sketch, such as exhibits D and E, showing provisions for compressed air prior to their being made has been put in evidence by appellant, nor is any account given in the testimony for appellant as to the origin of the structure for using compressed air in the complete device. In his testimony, Barnet did not explain any structural means for using compressed air, or even the broadest suggestion of such means upon which counts 1 to 4 would read.

It appears from his testimony that appellant was not familiar with certain matters explained in his patent application. In his application he stated that to use the cleaning device "* * * it is necessary to remove one of the workers which cooperate with the main cylinder to be stripped, and I have found that one of the workers on each of the main cylinders may be permanently dispensed with, if desired, without appreciably affecting the efficient operation of the garnetting machine. * * *" Yet, when asked on cross examination what modification was necessary on the garnett before this device could be applied to it, he replied, "I can't recall any. I am not a mechanic. I am not there all the time. I don't think I could answer that question." It is difficult for this court to understand how, as inventor of this device, appellant could have been unfamiliar with this particular modification which he indicated in his patent application to be necessary for the use of his device on a garnetting machine.

Appellee, after telling of the accident on May 15, 1946, testified that he contemplated doing something to stop accidents on the garnett; that when he went home that day he conceived the idea that "if it is possible to clean a card [carding machine] automatically, there is no reason why a garnett could not be cleaned automatically also"; that he thought at that time "The only changes that would have to be made and would be necessary were

316

that the dirt imbedded in the garnett wire, which is rigid wire, would need some agitation, to be caused either by compressed air and a brush or both combined"; that he did not have to think about the vacuum because "a vacuum cleaner on a card is a long established fact, but the air I thought about." He testified further that during that night he made small sketches and submitted them to Long the following day; that on May 16, 1946, he talked to his superior, Mr. MacLaren, who was at that time the superintendent of the mill, and discussed with him his idea for cleaning a garnett from the top with a vacuum and traverse device similar to that on a carding machine; and that he also told MacLaren at this time that "I could have a brush mounted on in front of the vacuum nozzle and have this brush mounted with a wire, strength 28 to 32 pressed, and also have an air jet running through that brush."

Appellee further testified that on the day following the accident he began his attempts to accomplish his idea; that he asked permission of Long to buy a wire brush; that he bought a rotary brush with ordinary wire, like a chimney brush; that he went to the machine shop and told Hill to make a bracket according to his sketch which would fit on the vacuum nozzle and asked Hill to temporarily weld this rotary brush into that bracket; that he tried this device and found that the wire did not have the temper to stand the friction and that it burned out. He stated that he then took the rotary brush out and made a sketch of a small block of wood and gave it to Long; that he had the shop carpenter make a block of wood, according to his sketch, with a hole in the center; and that he took off the wire which is mounted on leather backing from a hand card and put it on the block. Wied testified further that he then took this block into Long's office and that Long looked it over and asked, "What is this hole doing in the center?"; that MacLaren was present when this took place; that an hour later appellant Barnet came into Long's office and when shown this block appellant wanted to know "What the hole was there for in the

middle of the block"; and that he (appellee) explained to appellant and Long that "the hole is for a compressed air nozzle."

Long denied that he saw or received any sketches made by appellee. Long also flatly denied Wied's testimony about showing him a block with a hole in it and that he (Long) asked why there was a hole in the middle of the block. He testified further that "Mr. Barnet stated at a much later date that we would have compressed air in the center of the brushes." Appellant did not testify in rebuttal, and therefore there is no denial by him of Wied's testimony that he showed Barnet the block with the hole in it and explained its purpose to him.

According to Wied's testimony, he made drawings of this device over the weekend and had them notarized. These drawings were introduced as appellee's exhibits 1, 2 and 3 and bear the notation "Dated this 21 day of May 1946" above what purports to be the notary's signature and stamp. The notary, before whom it appears Weid's oath for the patent application was also sworn, was not produced as a witness. Appellee's account of making these drawings is otherwise uncorroborated.

Appellee further testified that in order to clean a garnett on top it is necessary to remove a worker and that on the day following the accident he experimented in running a garnett minus one worker and that "it was only possible to do so as you re-set the adjoining workers next to the place where this worker has been taken out."

MacLaren, who is now employed by the State of New York, testified that on May 15, 1946, he was superintendent at the Albany Woolen Mills plant; that on the day following the accident (May 16, 1946) Wied suggested to him the use of air in a device for stripping garnetts by means of a brush and a vacuum and using the air "through a hole in the block we had there * * *." MacLaren also testified that he was present when the block with a hole in it was submitted to Long by Wied; that Long asked why the hole was in it, and that appellee told him; and that he saw

appellee running the garnett without a worker but he could not remember what date.

Wied testified that, when photographs were taken of the device in December, 1946, Barnet, in the presence of Muhlfelder, offered him $150 and then $250 to compensate him for his work on the cleaner but that he refused to accept it. Muhlfelder testified in rebuttal that he did not recall such offers. Wied testified further that a few days later appellant called him to his office where appellant, Muhlfelder, Long and Hill were present; that appellant gave him, Long and Hill papers which he requested them to sign; that his paper (which was introduced in evidence as Wied's exhibit 4) was an assignment naming him as a coinventor and giving him 10 per cent of the net income from the device in return for his assignment; that Long and Hill signed their assignments in his presence but that he declined to do so until he could consult his attorney.

According to Wied, he was again called to appellant's office the following day and in the presence of Long he told appellant that he would not sign the assignment "due to the fact that Mr. Hill and Mr. Long, who were named as coinventors, did not contribute anything essential or fundamental on this cleaning device"; he also insisted that appellant withdraw Long's and Hill's names as coinventors. Wied stated further that at a later conference appellant agreed to withdraw Hill's name but not Long's; that he continued to insist that Long's name be withdrawn and that several days later in a meeting of appellee, Barnet, and Mr. Andros, attorney for Barnet, Mr. Andros advised appellant to take Long's name off as a coinventor in order to come to an agreement but that appellant refused to do so. Wied testified also that at a later meeting appellant agreed to take Long's name off the assignment as coinventor and offered appellee 25 per cent of the net income of the patent provided appellee would also take his name off as a coinventor; and that appellant then told him that he (appellant) wanted to make the application in his own name, to which appellee did not agree. According to Wied,

this was the first time he had heard of any claim by appellant or any one else that appellant was the inventor of the involved device. Wied testified also that Andros stated that he was in doubt as to who was the inventor or inventors in this case and suggested arbitrating the matter before three persons, one to be selected by appellant and one by appellee; that he later refused to go on with the arbitration upon advice of his attorney because Barnet proposed as the third party a man who was employed by Barnet in income tax matters.

There was no rebuttal testimony regarding appellee's story concerning the proposed assignments by appellant or Long or Hill.

Appellee says he "hooked up" and ran the garnett on all tests, and Muhlfelder testified it was appellee's duty to run the garnetts. None of appellant's witnesses explain what appellee's work on the device was. However, it seems to us that it must have been something more than merely being present at the tests in order for appellant to consider him as a coinventor, but appellant does not explain clearly what work appellee did or why he considered appellee as a coinventor.

Long and Hill were present when the assignments were presented to them and to appellee, but they did not question appellee's having at least a part in inventing the device, and they did not protest against appellee's inclusion as one of the inventors prior to this interference. Further, it seems clear from the record that only after appellee refused to accept appellant's proposal to arbitrate that appellant said he thought he had invented the device involved. Andros, Barnet's attorney, testified that he was in doubt as to whose name should properly go on the application; that after the proposed arbitration fell through, *"the thing hung around for a while and finally Mr. Barnet said he thought he had invented this device * * * and that he would like an application in his own name * * *."* [Italics supplied.]

Andros' testimony as a whole corroborates to a considerable extent Wied's story about the requested assignment, his insistence that he was sole inventor, and appel-

lant's delayed claim, after considerable controversy, that he (appellant) was the inventor.

In an interference proceeding involving the question of originality of conception, where there is conflict of testimony, the court may look to the unquestioned facts and circumstances that surround the transaction or occurrence and shed light upon it to ascertain whether they, and the proper inferences therefrom, corroborate or contradict one or the other of the parties. Gallagher v. Hastings, 21 App.D.C. 88.

In Fersing v. Fast, 121 F.2d 531, 28 C. C.P.A., Patents, 1318, we stated that in determining the question of originality it is worthy of consideration that of the two parties one would be the more likely to have made the invention because of his experience and background. It will be recalled that Barnet was unfamiliar with a modification of the garnett which his own application stated was necessary for employment of the device called for by the counts, and that his explanation for this was "I am not a mechanic." Wied's testimony, on the other hand, indicated that he was familiar with the garnetts and the mechanical features of the device and its application.

According to Wied's testimony, as corroborated by that of Andros, Barnet did not claim to be the inventor until after the controversy herein arose, and, in fact, not until after negotiations between the parties had broken down. On the other hand, it appears from the testimony of record, that Wied consistently insisted that he was the sole inventor. Such conduct by appellant may be considered as a factor tending to contradict his claim that he was the inventor. See De Forest v. Owens, 49 F.2d 826, 18 C.C.P.A., Patents, 1424.

Wied's story concerning the requested assignment, which recognized him as coinventor and offered him a royalty, is uncontradicted and unexplained by the testimony introduced in behalf of appellant. This offer is not conclusive as an admission of appellee's inventorship, since appellant is not conversant with the patent laws. However, such an offer, made *ante litem motam* and inadequately explained, may be regarded as a circumstance weighing adversely against appellant in deciding whether he has overcome the burden of proof placed upon him as junior party. See Jameson v. Ellsworth, 40 App.D.C. 164.

In our opinion, the above discussed circumstances tend to contradict appellant's claim that he is the inventor of the device in issue.

The testimony for appellant, particularly his own, is deficient in explaining the origin of the structural provisions for compressed air in the completed device covered by the counts and shown in appellant's exhibits L and M, which are photographs of the completed device.

We have carefully studied the evidence of record and think it establishes that appellee did have the block with a hole in it made and that appellant and Long did ask him to explain the purpose of the hole in the block. The structure for using compressed air first appears in appellant's evidence as Barnet's exhibit K, which Hill says he made between June 5 and 25, 1946. This is later than the time that Wied and MacLaren say the former showed such structure for using compressed air to appellant and to Long, from whom Hill received his orders.

In our opinion, there is no evidence that appellant had any definite plan for the use of compressed air prior to May 16, 1946, when appellee had the block with a hole in it made as testified to by appellee and corroborated by MacLaren. The testimony on behalf of appellant when given all reasonable benefit of doubt does not establish that appellant had any more than the vaguest notion of using compressed air. Certainly it does not meet the test of Robinson v. McCormick, supra. Nor does it establish that appellant communicated to appellee, directly or through others, the essential elements of the invention. See the Curtis and King cases, supra.

We think the record establishes that Barnet has not proved that he is the original inventor of the invention in issue by establishing that he conceived the struc-

ture defined in counts 1, 2 and 3, or necessary to effect the process of count 4. Further, we do not think that appellant has shown that he communicated to appellee the general plan of the invention in such detail as to enable the latter to embody the same in some practical form. Hence he has not, in our opinion, met his burden of proof under the rules of law discussed above.

In view of the foregoing, the decision of the board is affirmed.

Affirmed.