## GALLAGHER *v.* HASTINGS.

PATENTS; INTERFERENCE; BURDEN OF PROOF; EVIDENCE; ORIGINALITY; EMPLOYER AND EMPLOYEE; PRESUMPTIONS.

1. The burden of proof is cast heavily upon an applicant who is in interference with a prior patentee; but where the applicant claims conception and disclosure to the patentee and there is but one reduction to practice, that of the patentee, and the testimony of the applicant is clear and unshaken by cross-examination, it is sufficient for a time to overcome such burden of proof and compel the patentee to account for his claim of the invention.

2. When the burden of proof is upon a party to an interference, he cannot be said to have satisfied it where his testimony upon

material points has been flatly contradicted by an apparently credible, well-informed and positive adversary; but where such a conflict of testimony exists the surrounding facts and circumstances will be looked into, and are entitled to more or less weight and sometimes carry more than do the words of witnesses; *following* Beals v. Finkenbiner, 12 App. D. C. 23.

3. Any unfavorable inference arising from the failure to call as a witness the one person besides the parties to an interference who has any direct knowledge of their claims to the conception of the invention, will operate rather against the party in the employment of whose assignee such person is, the presumption being that the other party did not have an equal opportunity of knowing what his recollection of the occurrence might be.

4. Where one of the parties to an interference disclosed his conception of a device to the other and employed him to construct one, the relation of employer and employee existed, and any improvement upon the general idea made by the employee, especially where it did not involve invention, belongs to the employer.

5. Where the relation of employer and employee between parties to an interference is shown to exist, the burden is on the employee to show that the employment was not to give practical form to a conception of his employer, but merely to provide means to answer a general purpose, and that in so doing he had an independent conception of the way to accomplish that purpose.

No. 215.  Patent Appeals.  Submitted November 21, 1902.  Decided January 20, 1903.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.     *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Hervey S. Knight* for the appellant (*Mr. George H. Knight* being with him on the brief).

*Mr. Joseph L. Levy, Mr. Ernest Wilkinson,* and *Mr. S. T. Fisher* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an interference case involving the invention defined in the several counts of the following issue:

" 1. A body-bolster for railway-cars formed with elevated outer and middle portions and depressed intermediate portions, substantially as set forth.

" 2. A body-bolster for railway-cars formed with elevated outer and middle portions, and depressed intermediate portions having grooves to receive the sills of the car-body, substantially as set forth.

" 3. A body-bolster for railway-cars formed with elevated outer and middle portions adapted to bear against the floor of the car-body depressed intermediate portions adapted to receive the inner sills of the car-body, and end ledges adapted to receive the outer sills of the car-body, substantially as set forth.

" 4. A body-bolster for railway-cars formed with an upper and a lower flange and a centrally-located vertical connecting-web; said bolster having elevated outer and middle portions and depressed intermediate portions, substantially as and for the purpose set forth.

" 5. A body-bolster for railway-cars formed with elevated outer and middle portions, and depressed intermediate portions; said elevated portions being provided with center and side bearings on their lower surfaces, substantially as set forth.

" 6. A body-bolster for railway-cars constructed with an upper flange formed with elevated outer and middle parts and depressed intermediate parts, and with a lower flange formed with elevated outer and middle parts and depressed intermediate parts, substantially as set forth.

" 7. A body-bolster for railway-cars constructed with an upper flange formed with elevated outer and middle parts adapted to bear against the floor of the car-body, depressed intermediate parts adapted to receive the inner sills of the car-body, and end ledges adapted to receive the outer sills of the car-body, and provided with a lower flange formed with elevated outer and middle parts and depressed intermediate parts, substantially as set forth.

" 8. A body-bolster for railway-cars constructed with an upper and a lower flange and a centrally-located vertical con-

necting-web; said bolster having elevated outer and middle parts and depressed intermediate parts at top and bottom, substantially as set forth.

" 9. A body-bolster for railway-cars constructed with an upper flange formed with elevated outer and middle parts and depressed intermediate parts, and a lower flange formed with elevated outer and middle parts and depressed intermediate parts; said elevated parts of the lower flange being provided with center and side bearings on the lower surface, substantially as set forth."

In the beginning the burden was heavily cast upon the appellee, George S. Hastings, because his application was not filed until January 4, 1900, whereas the appellant, Thomas S. Gallagher, had procured a patent, some four months before, under an application made April 6, 1899.

The examiner of interferences and the examiners-in-chief were of opinion that this burden had not been overcome by the evidence on behalf of Hastings, and, in succession, decided in favor of Gallagher. On appeal to the Commissioner those decisions were reversed, and award of priority made to Hastings, from which this appeal has been prosecuted. The case presented is somewhat peculiar in its features. Neither of the nominal parties has any pecuniary interest in the controversy. The name of each is used for the sole benefit of his assignee. The assignee of Gallagher is the Shickle, Harrison & Howard Iron Co. of St. Louis where it carries on an iron and steel foundry, making, among other things, cast-steel bolsters for railway-cars. Hastings's assignee, the J. G. Brill Co. of Philadelphia, is a manufacturer of cars but has no foundry for casting the bolsters, and so forth, used in their construction. The only witnesses introduced were the nominal parties, each of whom testified on his own behalf, or, rather, on behalf of his assignee.

These were not independent inventors, working out the same conception separately and unknown to each other, but each claims the conception, and reduction to practice, of a construction that was set on foot by one, to meet a novel condition, and was manufactured by the other.

Certain undisputed facts lead up to the point of conflict between the witnesses and are essential to the determination of the claim of invention which is involved therein. Hastings is a mechanical engineer and as the representative of the J. G. Brill Co. went to St. Louis in August, 1898, to attempt to obtain the order for a number of motor-trucks for a street-car company of that city. A sample set of center pivotal bolster-trucks were sent for the inspection of the manager of that company to aid in the selection of new double trucks for a number of cars then mounted on Robinson radial trucks. Some of the company's cars were very large and wide with special framing, and Hastings sent on a sketch of this framing from which a blue-print was made, August 27, by the Brill Co. showing the conditions to be met. Sketch was also sent of car-body framing of cars mounted on the Robinson trucks. The framing of these cars precluded the use of the center pivotal trucks and demanded a maximum traction-truck which was not then provided by the Brill Co. The car company specially desired a swinging bolster and a truck that would carry the car as low as poossible. The Brill Co. sent out a truck designed for the wide-sill car first mentioned and Hastings returned to St. Louis October 2, 1898, and procured one of the cars which he mounted on the trucks about October 10. He had in the meanwhile, received a blue-print and model from the Brill Co. for trucks for the cars then on the Robinson trucks. This blue-print was dated October 6, 1898. Hastings found that the application of a truck made after this print would necessitate cutting out parts of the car-sills. This was objectionable because it would weaken the car. The problem was then to mount the car so as not to disturb the intermediate sills, and at the same time carry it low enough so that one step would answer for entry to the platform. With this problem in his mind Hastings called at the office of the Shickle, Harrison & Howard Co., with the view, as he states, of having them, under his direction, design a special bolster to suit the requirements of the Robinson car. He explained what he

wanted to Mr. Harrison and was turned over to Mr. Gallagher, the superintendent.

Gallagher had previously invented and patented a car-body bolster a feature of which was the ledge at each end for the support of the outside sills, but he admits that he had never thought of the invention of the issue until Hastings came to him to get him out of his difficulty. Passing for the present the conflict with respect to the invention, it appears that after the interview aforesaid, Gallagher's draftsman, named Palmquist, went down to the car with Hastings, and made additional sketches as well as exact measurements of the necessary parts of the car-frame. Patterns were made after drawings had been finally agreed upon, and the new bolster was cast and delivered to Hastings who arranged the truck and mounted the car. The Brill Co. paid the entire cost of the work including that of making the patterns for the castings. Hastings failed to obtain an order for cars as hoped for and nothing more was done, until the invention was subsequently utilized by the Shickle, Harrison & Howard Co. upon an order for the construction of other like bolsters.

Regarding the interview with Gallagher: Hastings said that after telling his trouble to Gallagher the latter " took me up to his drafting-room and introduced me to a draftsman, named Palmquist, and with Mr. Gallagher standing alongside, I explained the case to the draftsman as well as I could from the photographs and blue-prints, making some rough pencil sketches at the time, in order to illustrate the important features required, viz.: to have a bolster fit around the intermediate sills and at the same time have a factor of safety of four or five and to permit the car to be carried as low as possible without the trucks striking the bolster, especially when rounding minimum curves, to provide for the running through of the brake-rods and to carry the weight as far as possible from the outside sills. As this was something new to Mr. Gallagher and his draftsman they failed to grasp the idea entirely, and Mr. Gallagher suggested " the visit of the draftsman to the car-barn to take measure-

ments, etc. A few days after this, the draftsman completed a drawing. Then said Hastings further:

" We had to change this several times in order to suit all the requirements, as I found that in the preliminary sketch we had overlooked some of the necessary features, especially that of permitting the trucks to radiate around the minimum curve under a maximum load."

The sketch was finally traced off about October 12, 1898, and made a blue-print of which is in evidence and bears that date. Hastings further stated that the construction could not be begun at once though he was hurrying it, and that when the pattern was partially completed he decided to make a change from the design of the blue-print, consisting in making the lower member in which the body-pivot is placed, straight across instead of arched. The casting was then had from the patterns made as amended and delivered about October 19. This testimony, unshaken by cross-examination, was sufficient for the time, to overcome the burden of proof imposed upon Hastings, and compel his adversary to account for his claim of the invention.

Gallagher testified that he made the invention to accomplish the purpose of letting the sills down into the bolster so as to prevent increasing the height of the car. This necessitated the peculiar shape of the bolster. He then said:

" Mr. Hastings was figuring with the railroad company to put in trucks and he found it, as he stated, almost impossible to get his truck under the cars with any bolster as then made. He came to me and asked me to work it out for him; he said that he heard I had been in the business a long time and had gotten out several patents, and that I was the only one he could depend on working it out for him. The first thing we did, I got my draftsman to go to the car-sheds and take the necessary measurements from top of rails to the car-floor, then went to work to design a bolster that would meet the requirements. That was the result."

He further said that Palmquist made the drawings under his instructions; that Hastings took no part in it, and made or furnished no sketches. He admitted that " Mr. Hastings

used to come around to our office once and sometimes twice a day to see how we were getting along. I laid the matter aside for a few days, then I thought the poor fellow would go to the insane asylum."

In his cross-examination he further said:

"If Mr. Hastings had given me anything like an intelligent idea of what he wanted in the way of a sketch, no matter how simple, I could have worked it out. He was unable to even convey the slightest idea of what was required. He was in trouble, that was all, and wanted me to help him out."

He admitted that the thing was something entirely new to him and his draftsman when Hastings came to them.

It is to be noted also that when pressed on cross-examination to know whether "Hastings did not at any time suggest anything to the draftsman which led to the ultimate shape or design of this specific bolster" he answered: "Why, it was a condition that we could not simply escape. That was the only design that could be used there, and that settled it; that is all there was to it, and I had to work it out so that we had to make the casting and fit it in there, and that is all I know about it."

After careful consideration of the evidence of the respective parties, and the conflicting decisions of the tribunals of the Patent Office in respect of its purport and effect, we have little hesitation in concurring with the Commissioner. The other tribunals asserted the correct principle that when the burden of proof, whether heavy or light, is upon a party, he cannot be said to have satisfied it where his testimony on material points has been flatly contradicted by an apparently equally credible, well-informed and positive adversary.

On the other hand, they seem not to have been equally correct in applying the principle in the particular case.

Where there is such conflict of statement we naturally look to the unquestioned facts and circumstances that surround the transaction, or occurrence, and shed light upon it, to ascertain whether they, and the proper inferences therefrom, corroborate or contradict one or the other party. For such purposes they are always entitled to more or less weight, and

sometimes, even, carry more than do the words of witnesses. *Beals* v. *Finkenbiner,* 12 App. D. C. 23, 29, and cases cited.

Some of those facts and circumstances, which will be briefly considered, are consistent with each other and in our opinion tend, singly, to corroborate the story of Hastings in material particulars, and conjointly, to strengthen its credibility.

1. Hastings was the first to encounter the problem solved by this invention; he thoroughly appreciated the importance of its solution, and displayed intelligence, zeal and energy therein.

2. He was an educated mechanical engineer, with practical experience in the operation of motor-trucks and their adjustment to street-cars. He had no practical knowledge of the art of making castings, in which Gallagher was an unquestioned expert.

3. Hastings went to Shickle, Harrison & Howard Co., who were engaged in casting steam-railway bolsters, to see if a casting could be made to overcome the difficulty which he had encountered. Gallagher said that Hastings came directly to him because of his reputed skill in matters of such design and construction. Hastings said that he went to Mr. Harrison of the above company and was by him turned over to Gallagher who was the superintendent of the foundry. Harrison, one of the real parties to the controversy, was not called upon to testify.

4. The statement of Gallagher, heretofore quoted, expressly declares that a bare examination of the car that was to be equipped made it obvious that the design adopted was the only one that could be used. Now, Hastings had a complete knowledge of the car-body and went to the foundry men to obtain a construction adapted to its peculiarities. What was obvious to Gallagher as the only means to the end, could scarcely have escaped the observation of Hastings.

5. Hastings produced a letter written by him to the Brill Co. on October 10, 1898, in which he says:

" I am going to have a special cast-steel bolster made so as not to necessitate cutting the longitudinal stringers —

which will be a big point in favor of our truck, as La Clede cuts same almost in two."

This statement was followed by a sketch of his idea — the obvious one before referred to. This sketch discloses substantially the construction of the issue. He then adds:

" I will get Shickle & Harrison to design and cast same according to their own ideas and guarantee same in every respect. Plan to see them this A. M.

It is true that this letter might have been written *after* instead of *before* the interview with Gallagher. But the inference that it may have been written after that interview, and with the intent to appropriate Gallagher's idea as his own, seems inconsistent with his subsequent inaction in the matter.

The most reasonable inference is that he was transmitting to his employers the actual facts of the situation. Viewed in this light, the sketch shows that he had a thorough conception of the design necessary to conform to the construction of the car-body. The peculiar shape required it to be of cast-steel construction. It was one thing, however, to conceive the design, and another to know if it could be effectively carried out by means of casting. Whether a practical and durable bolster of that design could be made of cast-steel was a matter beyond his knowledge and he would naturally turn for information to men of skill and experience in the art. This seems a probable explanation of the paragraph saying he would " get Shickle & Harrison to design and cast the same according to their own ideas and guarantee the same in every respect."

6. There was but one person besides the parties themselves who had any direct knowledge of their respective claims to the conception of the invention.

This was the draftsman, Palmquist, who was present at the interview, and heard all that occurred. He went with Hastings to see and measure the car and prepared the drawings of the design adopted. The testimony on behalf of Gallagher was taken in St. Louis where were situated the works of his assignee, the Shickle, Harrison & Howard

Iron Co.  The testimony shows that Palmquist was still in the service of that company, and could have been called by either party.  It would seem that any unfavorable inference that may arise from the failure to call this witness ought to operate against Gallagher rather than Hastings.

It is hardly to be presumed that Hastings, or the Brill Co., had an equal opportunity with the Shickle, Harrison & Howard Co. to know what his recollection of the occurrence might be.  The latter have shown no want of zeal or diligence in the prosecution of their case, and it is hardly possible to believe that they did not know whose testimony Palmquist would corroborate if called to testify.

7. Gallagher, as has been noted, admitted that he would not have conceived the invention had not Hastings explained the difficulty he wished to surmont, and employed him to help him out of it.  The examiners-in-chief say in their decision in favor of Gallagher:

" It seems reasonably clear that Hastings disclosed the bolster which is the subject of his patent to Gallagher some time prior to the production of the exhibit-print of October 12, 1898.  *  *  *  In our view of the case, while it may be true that Hastings at the time of the several interviews with Gallagher and his draftsman had in contemplation the production of a bolster having recesses for receiving the longitudinal sills of a car, he did not at that time disclose to any one the specific construction of the pending issue which, as we have already stated, involves a bolster having not only outer elevated portions but a middle elevated portion."

Hastings did not claim to have suggested this middle elevated portion to Gallagher, and it seems to have been adopted while the patterns for casting were under construction.

However this may be, it is of no practical importance as it was a mere improvement upon the general idea the conception of which, moreover, did not involve invention. If Hastings disclosed the idea of a bolster with recesses for the sills to Gallagher and employed him to construct one of

that kind the relation of employer and employee, to which the law attaches certain consequences, was established between them. These consequences were thus stated by Mr. Justice Morris in a former case involving their consideration under somewhat different conditions:

" We regard it as well-settled law that, when one who has conceived the principle or plan of an invention employs another to perfect the details and to realize his conception, and the employee devises new and valuable improvements in the original conception or invention the improvements belong to the employer and not to the employee. *Milton* v. *Kingsley,* 7 App. D. C. 531, 537, and see *Agawam Co.* v. *Jordan,* 7 Wall. 583, 602; *Gedge* v. *Cromwell,* 19 App. D. C. 192–198; *Miller* v. *Kelley,* 18 App. D. C. 163–170."

Grant that it cannot be assumed from the statement of Hastings alone that he employed Gallagher to improve upon a specific design communicated to him, yet, the admissions of Gallagher sufficiently establish the relation of employer and employee in respect of a construction in the course of which the invention was made and completed. The principle controlling that relation imposed upon the employee, at least, the burden of showing that the employment was not to give practical form to a conception of his employer, but merely to provide means to answer a general purpose, and that in so doing he had an independent conception of the way to accomplish that purpose.

It would be unreasonable to give one who holds himself out as a manufacturer of machines, castings, and other constructions for others, the advantage of position in a claim of invention in any such construction over him who ordered and paid for it; and it is but just that in establishing such a claim he should be charged with the burden of proving that he had not received the general plan or conception from his customer and merely perfected it.

It does not follow from our conclusion in favor of Hastings, that Gallagher has made a willfully false claim to the invention of the former. He was himself an inventor as well as an expert in cast-steel construction, an art of which

Hastings had no practical knowledge. It was for him to determine the practicability of the casting, and his draftsman prepared the drawings for the patterns in the course of which he no doubt made valuable suggestions as he was expected to do. It was not unnatural, therefore, for him to persuade himself that he was entitled to the entire credit.

How readily this might be done he explained in his evidence in attributing a like impression to Hastings. He said:

" Some men run away with the idea at times that they are doing a whole lot when they are not. He thought he had accomplished a great thing when we made those bolsters for him."

Having found no error in the decision appealed from, it will be affirmed. It is so ordered; and that this judgment be certified to the Commissioner of Patents as required by law.                    *Affirmed.*