40 C.C.P.A.(Patents)

## HERRMANN v. OTKEN.

### Patent Appeal No. 5914.

United States Court of Customs and Patent Appeals.

Feb. 6, 1953.

Rehearing Denied March 6, 1953.

Emanuel R. Posnack, New York City (Almon S. Nelson, Washington, D. C., of counsel), for appellant.

John F. Robb and John W. Robb, Cleveland, Ohio (Clair W. Fairbank, New York City, of counsel), for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

O'CONNELL, Judge.

Appellant has here appealed from the decision of the Board of Interference Examiners of the United States Patent Office awarding to appellee pr'··-ity of invention of certain subject matter pertaining to an apparatus for coating frozen confections and defined by the five counts in issue. The interference involves the application of appellee Otken filed November 10, 1948, and the patent to appellant Herrmann issued October 5, 1948, on an application filed June 4, 1948. The counts were copied from Herrmann's patent, of which counts 1 and 2 are sufficiently illustrative:

"1. In an apparatus for covering, with a coating of solid particles, confections and the like having stems extending therefrom, a rack for holding said stems with the confection portions disposed on one side thereof, a rotatable drum for the coating material, and a motor connected to the drum; the drum having a peripheral wall and a plurality of spaced inwardly extending shelves disposed along the inner surface of the peripheral wall; the drum being further provided with an apertured portion, the rack being attached to the drum adjacent said apertured portion, whereby the stems operatively supported by the rack will extend through the apertured portion and the confection portions will be disposed within the drum.

"2. In an apparatus for covering, with a coating of solid particles, a group of confections and the like, a rotatable container for the coating material, means for mounting the confections in fixed mutual relation within the container, and means for rotating the container and group of confections as a unit, whereby the coating material within the container will be deposited upon the confections."

Both parties took testimony in the summer of 1950, filed briefs, including a reply brief by Otken, and both were represented at final hearing. Otken assigned his rights to the invention to his employer, the Good Humor Corporation of Brooklyn, New York, hereinafter referred to as Good Humor, and Herrmann assigned his rights thereto to his former employer, Conveyor and Machinery Manufacturers, Inc., of New York City, hereinafter described as Conveyor, Inc.

The invention of the counts was conceived during a discussion between appellant and appellee at a conference in Ot-

ken's office in the Good Humor plant. Each of the parties maintains his first disclosure of the invention was to the other party. Both parties rely on the same reduction to practice. The issue thus raised is one of originality.

Many material statements made by one side are denied by the other. There is no dispute that the apparatus defined by the counts was designed for automatically coating frozen confections consisting of molded ice cream pops with granulated nut meats, including almonds, cocoanuts, and the like, and that the invention displaced the common practice previously employed by Good Humor over a period of years whereby confections frozen and impaled on a stick were rolled by hand in a tray of particles of granulated nuts. The board described the apparatus in the following succinct terms:

"* * * The involved invention comprises a drum, similar to a cement mixer, having vanes or deflector blades mounted therein, and in which the granulated coating material is placed. A number of the confections, for example twenty four, are carried by a rack or stickholder which is insertable in a rectangular opening in the end of the drum with the confections extending into the drum. The drum is rotated slowly by means of a motor. As the drum rotates the blades carry the granulated material up and as it slides off of the blades it sprinkles or showers down over the confections uniformly coating the same. After the drum is given a few rotations it is stopped, the stickholder, carrying the coated confections, is removed from the drum, and the twenty four confections are then removed from the stickholder and inserted in paper bags, in which condition they are ready for disposal to the trade."

Appellant's brief adds the following pertinent point as to the operation of the apparatus:

"* * * In one aspect of the invention, the drum is rotated by means of a motor, and is stopped suddenly after one or more rotations. * * *

When the drum is stopped suddenly, excess materials that have accumulated on the confections are shaken off. * * *"

Certain unquestioned facts and circumstances otherwise surrounding the transaction between the parties and their assignees are subject to consideration in determining which one of the two parties would be the more likely because of his background and experience to have made the described invention. Brady v. Atlantic Works, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438; Barnet v. Wied, 195 F.2d 311, 39 C. C.P.A., Patents, 882, 892; Gallagher v. Hastings, 21 App.D.C. 88.

The old system for coating the granulated confections by hand was discarded by Good Humor at its Brooklyn plant after the season of 1947. Accordingly, the installation of entirely new equipment to mechanize the operations of the factory on a continuous basis was decided upon to expedite the volume of business and reduce the cost of production for the season opening early in 1948.

One part of the remodeling project called for an overhead conveyor for a chocolate tank utilized by Good Humor for dipping and coating the confections merely with chocolate. The tank was no part of its overhead conveyor and the order for the installation thereof was given by Otken, superintendent of Good Humor, to Bindery Developers, Inc., predecessor of Conveyor, Inc., with the result that appellant Herrmann put in time almost every day early in 1948 at the Good Humor plant constructing and installing the conveyor hereinbefore described. That device, which generally had been designed by Otken, was produced by Herrmann and those with whom he was associated.

One day during that period Herrmann and Otken discussed certain features of the overhead conveyor and Otken asked Herrmann if a vibrating unit containing granular material could be substituted for the chocolate dipping tank. After considerable discussion, it was concluded that a good coverage of granules could not be produced by this method.

A second conference took place in Otken's office a week or so later and the controversy herein had its origin there. In the meantime, Otken testified, the thought had come to him that an apparatus similar in action to that of a cement mixer would elevate the granulated particles in the drum and shower them down upon the confections impaled therein. Here is Otken's version, so far as material, as to what took place:

"Q. 65. Proceed with your description as to the discussion that took place about the idea of this coating machine of the cement mixer type. With those present, will you tell us what was said and what was done, if anything, at that particular time? A. In this conference between Mr. Bader, Mr. Trinsch, Mr. Herrmann and myself, after considering the problem at hand and this discussion in reference to the cement mixer, I drew a sketch on a yellow pad of a rotary drum showing louvres inside the drum for taking the material up to the top of the drum and dropping it down in the shower.

"Q. 66. Will you say what those louvres are a little more clearly? A. They are pieces, or lugs, approximately two inches—it would be two inches in practice—that run on the inside of the periphery of the drum and are spaced into this.

"Q. 67. And rotate with the drum? A. And rotate with the drum.

"Q. 68. Is that like the blades of a cement mixer, somewhat? A. Similar to it, yes, sir.

"Q. 69. All right. Now proceed with your story. A. I remember this particular discussion, because the question came up as to the location of the bracket to be coated with this drum.

"Q. 70. What do you mean by bracket to be coated? A. The stickholder holding the confections.

"Q. 71. The location of that with respect to the drum? A. That is right. And I specifically remember our Mr. Bader making the suggestion that

this stickholder be fastened in the outer periphery of the drum. After studying that suggestion, I told him that I didn't think it was practical for two reasons: One, that the stickholder would extend beyond the periphery of the drum and rotate with it and, to me, would become quite a hazard; secondly, that the Anderson stickholder, the way it is constructed and with the sight holes in it, would allow the coating material to sift through the sight holes and also the holes around the stick, and we would run into considerable difficulty in keeping the material in the drum.

"Then I told him, 'No; we will put the stickholder in the center of that drum,' and I so indicated on the sketch.

"Q. 72. What do you mean by center of that drum? A. Center of the one end wall opposite from the drive of the motor.

"Q. 73. Continue. A. And to carry out this program I told Mr. Herrmann to build us one of these drums.

"Q. 74. Wait a minute. Did you say you made a sketch of that? A. Yes, I made a sketch.

"Q. 75. If I give you a piece of paper can you make a rough replica of that sketch? A. Yes.

"Q. 76. Do you remember what kind of paper it was made on? A. Lined yellow paper.

\* \* \* \* \* \*

"Q. 96. Did Mr. Herrmann in due course of time deliver the drum unit? A. That is right, sir.

"Q. 97. Was the motor equipment on the drum at the time of delivery? A. No.

"Q. 98. Why wasn't the motor on the drum; if you know? A. After I had instructed our mechanic, Mr. Trinsch, to go to our warehouse with Mr. Herrmann to give him a motor to propel this drum, after the two arrived at the warehouse, Mr. Herrmann stated that he saw no purpose in taking another motor over to his plant, that he had already one motor over there of

this type that he was using on the conveyor that he was building for us, and there was no point in carting a heavy motor to New York and bringing it back again.

"Q. 99. What was the main purpose in having the motor, anyway, for use in building the drum? A. It was to rotate the drum.

"Q. 100. Why did you have in mind using a brake motor? A. At the time of the building of this, the brake just happened to be incidental to the motor. That was the only type of motor that we had in stock that had a slow countershaft speed that would be applicable to this particular job, and the brake was just incidental to that motor. It was part of that particular motor.

"Q. 101. Was it necessary that the drum be designed any way to fit the motor? A. Yes; to fit the countershaft of the motor, so that the drum could be applied directly to the countershaft of the motor.

"Q. 102. And supported by the countershaft? A. That is right.

"Q. 103. At the time that you discussed this drum unit construction with the sketch with Mr. Herrmann, did he make any suggestions concerning the unit? A. Not to my knowledge.

"Q. 104. And at that time there was no production in your factory, was there? A. No.

"Q. 105. You had not started up for the season? A. No.

"Q. 106. Do you have the sketch that you gave Mr. Herrmann, Mr. Otken? A. No.

"Q. 107. It was never returned to you? A. No.

"Q. 108. Did you ever ask for its return? A. No."

Herrmann began working in the plant of Good Humor and the relations between the respective parties, their employees and associates were then on a basis of mutual cordiality. Later developments resulted in litigation between the parties in other tribunals respecting certain conveyors and services which appellant's firm had furnished to Good Humor. The latter paid $1,500 for whatever service and equipment had been supplied by the former.

During the prosecution of the interference in 1950 the witnesses of each of the respective parties sufficiently corroborated their testimony in regard to the transactions of early 1948. Documentary and physical exhibits were likewise involved. Such a situation requires careful scrutiny of the evidence bearing in mind the tendency of witnesses, granting them to be of the highest character, to confuse knowledge acquired subsequent to an event with that acquired at the time the event occurred. Deering v. Winona Harvester Works, 155 U.S. 286, 15 S.Ct. 118, 39 L.Ed. 153; Langevin v. Nicolson, 110 F.2d 687, 27 C.C.P.A., Patents, 1022.

Otken makes the following pertinent statement on the point under discussion:

"Otken's automatic controls were on all factory operating machines, during April and May 1948 as installed by Gutherman, the electrician, at the factory, and long before Herrmann's filing date of June 4, 1948. They were in use before drawings were even made later for purposes of his patent application. It is noteworthy as regards the above references to the record that Herrmann before his deposition personally heard Otken's testimony of the 'rapid stopping action' of the motor * * *."

In any event, Herrmann contends he built or suggested every essential element of the apparatus of the invention. The board, however, held that it was not Herrmann but Otken who "intellectually dominated the situation":

"That this is the correct conclusion is further borne out by the fact that although Herrmann had a Good Humor brake motor with its built-in proper speed-reducing gear in his shop, he suggested a ring gear for reducing the speed of a motor equipped with a magnetic brake. Herrmann also testified

914

that the drum could be tipped to control the direction of the falling granules, yet the supporting stand, when delivered contained no adjustable means for controlling its tilt. This adjustable means was added later by Good Humor. If this idea was suggested by Herrmann, it would seem that he would have had the adjusting means on the supporting stand when it was delivered."

The board in its long and carefully prepared opinion further analyzed and evaluated all of the contentions of the parties and the sharply contested evidence upon which they relied to support their arguments. We have carefully considered the same, together with the facts and circumstances surrounding the involved transaction, and concur in the following conclusion which constitutes the basis of the award of priority to the party Otken:

"For the foregoing reasons we are of the opinion and therefore so hold that there was an intermingling of ideas between Herrmann and Otken at the conference on February 9, 1948; and, for the reason that we have *assumed* Herrmann's adduced evidence correctly records the events, it may appear that Herrmann was the first to suggest the rotary drum with interior deflecting blades but it was Otken, with his superior knowledge with respect to ice cream confections, who finally determined which suggested idea would in all probability prove successful, and it was he who supervised the reduction to practice, and from his knowledge, made proper suggestions which changed the results of the tests from defeat into a successfully operating machine; Otken, therefore, will be awarded priority of the subject matter here in issue."

It is deemed unnecessary in view of the conclusion hereinbefore expressed, to state and discuss other points raised by counsel for the respective parties. The decision of the Board of Interference Examiners is accordingly affirmed.

Affirmed.